UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

ARONOV, SZUMILO, TALAVERA, and
VELEZ,

Plaintiffs,

- against -

CITY OF NEW YORK, JOHN, AKHTAR,
MERCADO, KING, and COLON

------------------------------------------------------------- X

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 0 8 2016 ★

BROOKLYN OFFICE

**MEMORANDUM DECISION AND
ORDER**

14-cv-06952 (AMD)(JO)

**ANN DONNELLY,** District Judge.

The plaintiffs, police officers in the New York City Police Department, bring this action
alleging discrimination and a hostile work environment based on their race, gender, national
origin, and religion, as well as retaliation for their complaints about that discrimination, against
the City of New York and individual NYPD officers at the 83rd Precinct in Brooklyn, New
York. Specifically, the plaintiffs bring claims under 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), 42
U.S.C. § 1983, 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), and the
New York City Human Rights Law ("NYCHRL"). Before me is the motion by the City of New
York and defendants Lieutenant Waheed Akhtar, Sergeant Tara King, Police Officer Angel
Colon, and Sergeant Jose Mercado (the "City Defendants") to dismiss the plaintiffs' Amended
Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the
defendants' motion is granted in part and denied in part.

1

## FACTUAL BACKGROUND

The plaintiffs, Albert Aronov, Przemyslaw ("Pete") Szumilo, John Talavera, and Gabriel Velez, were all police officers at the New York City Police Department's 83rd Precinct, located at 480 Knickerbocker Avenue in Brooklyn New York. [1]  (Amended Complaint (ECF 24), ¶ 57.) Aronov, who joined the NYPD on January 20, 2004, was born in Uzbekistan, and is a practicing Jew who speaks with a "noticeable accent." (*Id.* ¶¶ 5, 140.)  Szumilo was born and raised in Poland, and is a practicing Catholic who also speaks with a "noticeable accent." (*Id.* ¶ 6.)  He joined the NYPD on July 1, 2003. (*Id.* ¶ 209.)  Talavera, who is of Hispanic descent, joined the NYPD in July 2007. (*Id.* ¶¶ 7, 301.)  Velez was born and raised in Colombia, and speaks with a "noticeable accent." (*Id.* ¶ 8.)  He joined the NYPD on January 23, 2007. (*Id.* ¶ 354.)  The plaintiffs all worked in the "Conditions Unit" at the 83rd Precinct, which they describe as a specialized detail as compared to other patrol officers' "routine assignments." (*Id.* ¶ 58.)[2]

The plaintiffs assert claims against the City of New York, as well as against individual NYPD officers at the 83rd precinct.  Defendant David John is a "Hispanic male, who self-identifies as black," and who served as a sergeant in the New York City Police Department. (*Id.*

---

[1] On October 20, 2015, plaintiff Ann Cardenas filed a Second Amended Complaint against the City of New York, Sergeant David John, and Police Officer Angel Colon. (ECF 33.)  On October 21, 2015, Magistrate Judge Orenstein directed that Ms. Cardenas's claims be severed from those of the other four plaintiffs, and that a new civil action be opened with her Second Amended Complaint as the initiating document. (*See* E.D.N.Y. Docket No. 15-cv-06046(AMD)(JO).)  While the City defendants appear to move to dismiss some of Ms. Cardenas's claims, their motion to dismiss was filed before Ms. Cardenas filed her amended complaint and her claims were severed.  Therefore, Ms. Cardenas's claims are no longer part of the present action, and the Court does not consider them here.

[2] Aronov and Szumilo have been assigned to the Conditions Unit since July 2012, Talavera has been assigned there since January 2013, and Velez has been assigned there since January 2013. (Amended Complaint ¶¶ 141, 210, 302, 355.)

2

¶ 11.)[3]  According to the Amended Complaint, John was the plaintiffs' "direct supervisor," and had the authority to "make tangible employment decisions" relating to them, including changes of assignments and tours, grants or denials of overtime requests, recommendations for transfers or promotions, and instituting disciplinary proceedings. (*Id.* ¶¶ 58-59.)  Defendant Lieutenant Akhtar is an Asian male, Sergeant Mercado is a "light-skinned Hispanic male," Sergeant King is a white female, and Police Officer Angel Colon is a Hispanic male. (*Id.* ¶¶ 12-15.)  Defendants John, Akhtar, Mercado, and King were the plaintiffs' supervisors at all relevant times. (*Id.* ¶¶ 11-14, 58.)

**Allegations as to Defendant David John**

The plaintiffs each make numerous allegations against defendant David John; a representative sample is set forth here.

Each of the plaintiffs allege that John engaged in a pattern of offensive behavior.  For example, Aronov alleges that John repeatedly called him a "dirty Jew" or a "dumb Jew" (*id.* ¶¶ 142-43; *see also* ¶ 158), and that John "would often belittle Aronov due to the different customs in his religion." (*Id.* ¶ 162.)  Talavera alleges that John repeatedly called him "homosexual," "faggot," "Mexican," "greasy," "child molester," and "pedophile" (*id.* ¶ 303), and said that Talavera "look[ed] like a Mexican crack head." (*Id.* ¶ 306.)  Szumilo alleges that John repeatedly made offensive remarks to him, calling him a "dumb Pollock" and "dumb immigrant," (*id.* ¶ 211-215), a "dirty Jew" like Aronov, and that he was "lucky that Hitler didn't kill all the Poles

---

[3] The Corporation Counsel does not represent defendant John in this action. On November 9, 2015, the Court ordered counsel for Mr. John to file a status letter within ten days advising the court as to whether he intended to move to dismiss the complaint, and, if so, the date by which he would file a letter requesting a pre-motion conference in advance of his anticipated motion.  On November 19, 2015, Mr. John's counsel advised the Court that he would not file a motion to dismiss pursuant to rule 12(b)(6). (ECF 38.)  The plaintiffs' claims against Mr. John in his individual or official capacity are therefore not at issue in this decision.

and Jews." (*Id.* ¶ 216.)  Velez alleges that John repeatedly called him "taco" and "Mexican." (*Id.* ¶ 356.)

The plaintiffs also allege that John touched and grabbed them inappropriately.  For example, they each allege that John regularly grabbed their buttocks and groin areas.  (*Id.* ¶ 144 (Aronov alleges that John "repeatedly" grabbed his butt and groin area); *id.* ¶¶ 364, 381 (Velez alleges that John "constantly" grabbed his butt and groin area); *id.* ¶¶ 219, 239, 243, 247-48 (Szumilo alleges that John grabbed his butt and groin area); *id.* ¶¶ 312, 329 (Talavera alleges that John "constantly" grabbed Talavera's "butt and groin area.")).  They further allege that John repeatedly rubbed and caressed their thighs while they were driving, (*id.* ¶ 148 (Aronov); ¶ 368 (Velez); ¶ 223 (Szumilo); ¶ 316 (Talavera)), and Aronov and Szumilo allege that John often took their hands and made them touch his crotch while driving.  (*Id.* ¶ 148 (Aronov); ¶ 224 (Szumilo)).

The plaintiffs also allege that John showed them pictures of his penis, and often pulled down his pants in front of them.  (*Id.* ¶¶ 154-55, 159 (Aronov); *id.* ¶¶ 237, 246 (Szumilo); *id.* ¶¶ 376-77, 380 (Velez); *id.* ¶¶ 324-25, 328 (Talavera).)  Szumilo, Aronov and Talavera also allege that John showed them videos of himself having sex. (*Id.* ¶¶ 150 (Aronov), ¶ 231 (Szumilo), ¶ 319 (Talavera), and Talavera alleges that John made comments about raping Talavera's girlfriend.  (*Id.* ¶ 309).  The plaintiffs also allege that John made sexually-charged comments; for example, they allege that he would say 50-70 times per day, "I want to get my dick sucked" or "can I smell your muffin?"  (*Id.* ¶ 147 (Aronov); ¶ 218 (Szumilo); ¶ 314 (Talavera); ¶ 366 (Velez).)  John greeted male officers at the front desk by saying, "What's up . . . get your dick sucked?"  (*Id.* ¶ 146 (Aronov); ¶ 217 (Szumilo); ¶ 313 (Talavera); ¶ 365 (Velez).)  The plaintiffs

4

all allege that they witnessed John asking Ms. Cardenas to hold his penis.  (*Id.* ¶ 159 (Aronov); ¶ 246 (Szumilo), ¶ 328 (Talavera), ¶ 380 (Velez).)

Further, Aronov alleges that in the summer of 2013, John threw him down and climbed on top of him, yelling, "I'll rape you like in jail (*id.* ¶ 152), and that John made sexual comments about Aronov's wife.  (*Id.* ¶¶ 160, 163).  Velez and Talavera allege that they witnessed this incident (*id.* ¶ 321 (Talavera); ¶ 373 (Velez)), and that they also witnessed John do the same thing to Ms. Cardenas and threaten to rape her. (*Id.* ¶ 322 (Talavera), ¶ 374 (Velez).)

Szumilo alleges that John punched him in the chest or back on at least seven occasions in November and December of 2013.  (*Id.* ¶¶ 219-221.)  He further alleges that John made frequent sexual comments about Szumilo's ex-wife, including threatening to take steroids and then go to Szumilo's ex-wife's house and rape her while Szumilo's son watched.  (*Id.* ¶ 282.)  John said to Szumilo, "I could kill you if I wanted to" (*id.* ¶ 221), and once pinned Szumilo against a car (*id.* ¶ 250); John also threatened that he would prevent Szumilo from becoming a sergeant.  (*Id.* ¶ 267.)  Szumilo also alleges that his requests for time off were torn up, but does not identify by whom. (*Id.* ¶ 276.)  He also claims that John tore up any transfer request that he made (*id.* ¶ 277), and that whenever he complained about John's behavior, John threatened to punish him with undesirable assignments.  (*Id.* ¶ 278.)

Velez and Talavera also both allege that that when they complained to John about his behavior, he threatened them with "punishment posts."  (*Id.* ¶ 399 (Velez); ¶ 347 (Talavera).)  In addition, they claim that any requests they made for time off were torn up, but do not identify by whom, and that when they asked to transfer out of the Conditions Unit due to John's harassment, he denied their requests.  (*Id.* ¶¶ 397-398 (Velez); ¶¶ 345-46 (Talavera).)

**Defendant Mercado**

According to Aronov and Szumilo, after John left the Conditions Unit on terminal retirement leave, his replacement, Sergeant Mercado, "picked up where John left off." (*Id.* ¶ 177 (Aronov); *id.* ¶ 285 (Szumilo).) For example, Mercado asked Aronov, "[H]ow do I know you're not a terrorist from Uzbekistan?" and referred to Aronov as a "Chechenian terrorist." (*Id.* ¶ 181.) Szumilo alleges that Mercado called him a "dumb Pollock" and told a joke about Polish people. (*Id.* ¶ 286.)

Aronov and Szumilo also claim that Colon, in Mercado's presence, said that he wanted to suck Cardenas's toes. (*Id.* ¶¶ 178, 287.) Mercado "merely laughed and did nothing," and "[r]ather than address the situation with Defendant Colon appropriately," Mercado threatened that he would force Cardenas to work with Colon. (*Id.* ¶¶ 178-79, 287, 289.) Colon also said to Cardenas, while Aronov, Szumilo, and Mercado were present, "I want to lick your ass." (*Id.* ¶¶ 180, 290.) Mercado responded, "I'll call EEO for you, Ann," and then "laughed inappropriately." (*Id.* ¶¶ 180, 290.)

**Defendant Colon**

Both Aronov and Szumilo allege that they witnessed defendant Colon threaten to rape Cardenas, as well as a January 9, 2014 incident in which Colon made sexual remarks to Cardenas and grabbed her. (*Id.* ¶¶ 175, 283.) As described above, Aronov and Szumilo also both allege that Colon told Cardenas that he wanted to suck her toes and "lick [her] ass." (*Id.* ¶¶ 178, 180, 287, 290.)

6

**Defendant Akhtar**

Each of the plaintiffs alleges that defendant Akhtar told John to "stop the sexual

innuendo," but that no "official complaint was made nor was any investigation conducted." (*Id.*

¶ 166 (Aronov), ¶ 272 (Szumilo), ¶ 341 (Talavera), ¶ 393 (Velez)).

**Defendant King**

Aronov and Szumilo allege that "[m]uch of the discrimination and harassment was done

in front of the Integrity Control Officer, defendant Sergeant King," but that she "did nothing and

was even harassed by John herself." (*Id.* ¶¶ 176, 284.) Szumilo and Aronov allege that they saw

John repeatedly slap King's buttocks, and Szumilo alleges that he witnessed John say to King,

"[O]h you're going home?  Just wait for me in your car and I'll come and rape that white

muffin." (*Id.* ¶¶ 176, 284.)

**The plaintiffs' EEOC complaints and alleged retaliatory actions**

Each of the plaintiffs filed complaints with the EEOC.  Aronov filed an EEOC complaint

on February 3, 2014, submitted a supplemental charge of discrimination on February 20, 2014,

and submitted a second supplemental charge on June 16, 2014. (*Id.* ¶¶ 21-23.)  He received a

right to sue letter from the EEOC on August 29, 2014. (*Id.* ¶ 24.)  Szumilo filed an EEOC

complaint on February 3, 2014, a supplemental charge of discrimination on March 7, 2014, and

received a right to sue letter from the EEOC on August 29, 2014. (*Id.* ¶¶ 25-27.)  Talavera

submitted a complaint with the EEOC on February 11, 2014 and received a notice of right to sue

on August 29, 2014. (*Id.* ¶¶ 28-29.)  Velez submitted an EEOC complaint on February 11, 2014,

and received a notice of right to sue on August 29, 2014. (*Id.* ¶¶ 30-31.)

All the plaintiffs allege that they suffered retaliation due to their EEOC complaints,

although, for the most part, they do not identify the supervisors or officers who retaliated against

them. They each allege that other officers gave them the "cold shoulder" after they filed their complaints, (*id.* ¶ 184 (Aronov), ¶ 292 (Szumilo), ¶ 351 (Talavera) ¶ 404 (Velez)), and Szumilo and Aronov both allege that supervisors threatened to take them out of the Conditions Unit. (*Id.* ¶ 185 (Aronov); ¶ 293 (Szumilo).) Aronov also alleges that he has received inferior assignments, including a foot post and transporting prisoners, that his request to transfer to the Intelligence Division was denied, that Mercado threatened Aronov that he would not be able to work with Szumilo anymore, and that his supervisors improperly refused to classify an injury as line-of-duty. (*Id.* ¶¶184-207.) Aronov further alleges that after he filed his EEOC claims, someone said, "[S]hut up, rat" over the radio, and that someone flattened his car tires and put nails in them in April and May 2014. (*Id.* ¶¶ 192, 194-97.) Szumilo says that since he made his complaints, unidentified officers have refused to sign off on his arrest paperwork. (*Id.* ¶ 292.) In addition, he alleges that after he passed the sergeant's exam, Sergeant Ben-Safar told him not to spend time with Aronov and Cardenas, and that he was "being watched at all times." (*Id.* ¶¶ 295-97.) Talavera alleges that his requests for time off have been torn up, that John denied his request to transfer out of the Conditions Unit, that he has been threatened with inferior assignments, and that he even changed his tour "in an attempt to escape John's harassment and discrimination." (*Id.* ¶¶ 346-352.) Velez also alleges that he changed his tour in an attempt to escape John's harassment, and that he has suffered further retaliation since the time of filing this action; his gun and shield have been removed and he has been denied all overtime opportunities this year, resulting in lost wages. (*Id.* ¶¶ 405-406.)

The plaintiffs also maintain that since they filed this action, they "have had arrests taken away from them and reassigned to other officers," and have had their arrests "lowered from

felonies to misdemeanors." (*Id.* ¶ 65.) They allege that this has hampered their prospects for career advancements. (*Id.*)

**ANALYSIS**

## I.    STANDARD OF REVIEW

A court evaluating a 12(b)(6) motion must accept as true the factual allegations in the complaint and draw all reasonable inferences in the plaintiffs' favor. *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012). However, a claim will survive a Rule 12(b)(6) motion only if the law recognizes the claim, and if the complaint pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While it does not require "detailed factual allegations," this standard requires more than "a formulaic recitation of the elements of a cause of action" and more than an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). In the context of an employment discrimination suit, the plaintiff must allege sufficient non-conclusory facts to "nudge" his claim "across the line from conceivable to plausible." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (citing *Twombly*, 500 U.S. at 570).

## II.   STATUTE OF LIMITATIONS

The defendants argue that the plaintiffs' Title VII claims are time-barred in part because some of the conduct underlying those claims occurred more than 300 days before they filed charges with the EEOC. (Memorandum of Law in Support of City Defendants' Partial Motion to Dismiss the Amended Complaint ("Def. Mem."), ECF 42, at 8.) They argue that since Aronov

9

and Szumilo each filed EEOC charges on February 3, 2014, the claims that "accrued" prior to April 9, 2013 are time-barred. (*Id.*) Talavera and Velez filed EEOC charges on February 11, 2014; according to the defendants, this means that any claims "accruing prior" to April 17, 2013 are time-barred. (*Id.*) In response, the plaintiffs cite the "continuing violations" doctrine for the proposition that as long as one act is within the limitations period, all acts are brought in. (Plaintiffs' Memorandum of Law in Opposition to City Defendant's Motion to Dismiss the Amended Complaint ("Pl. Mem."), ECF 44, at 25.)

Before filing a Title VII action in federal court, a plaintiff must first file charges of employment discrimination with the EEOC. The plaintiff must do so within 180 days of the alleged discrimination, or within 300 days if, as here, the plaintiff first files a charge with the state or local employment agency. 42 U.S.C. §§ 2000e-5(a), (e); *see also Vega*, 801 F.3d at 79 (quoting 42 U.S.C. § 2000e-5(e)(1)). As a general rule, claims about conduct that occurred more than 300 days before filing a charge with the EEOC are time-barred. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996). As the Supreme Court explained in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act;" the Court identified "termination, failure to promote, denial of transfer, or refusal to hire" as "easy to identify" acts constituting "discrete discriminatory act[s]." *Id.* at 114. Therefore, with respect to their Title VII discrimination claims—which must be based on identifiable adverse employment actions—the plaintiffs can only base their claims for acts of discrimination within the appropriate time period. *See Lambert v. Genesee Hospital*, 10 F.3d 46, 53 (2d Cir. 1993), overruled on other grounds by *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105 (2d Cir. 2015) ("[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism," such as discriminatory

seniority lists or employment tests, do not amount to a continuing violation).  As Aronov and

Szumilo each allege that they filed charges with the EEOC on February 3, 2014, any of their

discrimination claims that accrued prior to April 9, 2013 are time-barred.  Talavera and Velez

each filed charges with the EEOC on February 11, 2014; therefore, any of their discrimination

claims accruing prior to April 17, 2013 are time-barred.[4]

Title VII claims for a hostile work environment, on the other hand, "are different in kind

from discrete acts" because "[t]heir very nature involves repeated conduct." *National R.R.*

*Passenger Corp.*, 536 U.S. at 115.  As a result, under the "continuing violation" doctrine, if a

Title VII plaintiff has experienced an "ongoing policy of discrimination, all claims of acts of

discrimination under that policy will be timely even if they would be untimely standing alone."

*Nghiem v. U.S. Dept. of Veterans Affairs,* 323 Fed.Appx. 16, 17 (2d Cir. 2009) (quoting

*Patterson v. County of Oneida*, N.Y., 375 F.3d 206, 220 (2d Cir. 2004)).  Pursuant to the

continuing violation doctrine, the statute of limitations runs from the "last act" of discrimination.

*Id.*

In order for the continuing violation doctrine to apply, a plaintiff must allege "both the

existence of an ongoing policy of discrimination and some non-time-barred acts taken in

furtherance of that policy."  *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999.)

Moreover, in the statute of limitations context, dismissal pursuant to rule 12(b)(6) is "appropriate

---

[4] The Second Circuit has held that where a plaintiff's claim of retaliation is "reasonably related" to her filing of discrimination charges with the EEOC, she need not file a second charge with the EEOC about the alleged retaliation before bringing her claim in federal court. *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001).  Here, as explained in Section IV, *infra*, the plaintiffs have not adequately alleged that they were retaliated against for filing charges with the EEOC.  Therefore, the Court does not reach the issue of whether the plaintiffs' retaliation claims are sufficiently related to their discrimination charges so that the 300-day filing limitation would not apply.

only if a complaint clearly shows the claim is out of time." *Id.* Here, each plaintiff alleges repeated conduct, including that David John "repeatedly" insulted them with racial and sexual epithets, subjected them to unwanted and inappropriate touching, and that the employer did nothing to address or remedy his behavior. As the plaintiffs have sufficiently alleged a continuing violation by the City[5], it would be premature, at this early stage of the case, to conclude that any of the alleged conduct underlying the plaintiffs' Title VII hostile work environment claims are time-barred.

## III.   DISPARATE TREATMENT CLAIMS

The plaintiffs claim that the defendants subjected them to disparate treatment under Title VII, § 1981, § 1983, the NYSHRL, and the NYCHRL due to their race, gender,[6] national origin, and religions.[7]

---

[5] The plaintiffs' claims under Title VII are asserted only against the City.

[6] One form of gender discrimination under Title VII "is sexual harassment that results in a 'hostile or abusive' work environment." *Galdieri-Ambrosinit v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (internal citation omitted); *see also Hayut v. State University of New York*, 352 F.3d 733, 744-45 (2d Cir. 2003) ("Section 1983 sexual harassment claims that are based on a 'hostile environment' theory . . . are governed by traditional Title VII 'hostile environment' jurisprudence."). As the plaintiffs appear to be asserting a hostile-work environment based claim for gender discrimination, rather than gender discrimination claims based on disparate treatment or impact, the plaintiffs' gender discrimination claims are considered in section V, below. *See, e.g.,* Pl. Mem., at 21 ("It is simply illogical to suggest that the unwanted grabbing of a sexual nature is not sexual harassment based on gender."). To the extent that the plaintiffs did intend to claim gender discrimination that is separate from a claim for gender-based hostile work environment, they have not alleged facts that support a claim that they suffered adverse employment actions because they are male. *See Bermudez v. City of New York*, 783 F.Supp.2d 560, 585 (S.D.N.Y. 2011) (dismissing claims for gender discrimination because "[n]o facts are alleged suggesting gender-based discrimination other than hostile work environment or sexual harassment."). Therefore, the plaintiffs' claims for gender discrimination under Title VII, § 1983, the NYSHRL, and the NYCHRL, as separate from their claims for a gender-based hostile work environment, are dismissed.

[7] Plaintiffs Aronov, Szumilo, Talavera, and Velez all bring claims of discrimination due to their race, gender, and national origin. In addition to those claims, plaintiff Aronov also brings claims for discrimination due to religion. The plaintiffs' Title VII claims are brought only against the

## A.    Title VII, § 1981, § 1983, and NYSHRL Disparate Treatment Claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin," 42 U.S.C.A. § 2000e-2. The NYSHRL mirrors this language, and courts analyze these federal and state claims in tandem. *Brown v. Daikin America, Inc.*, 756 F.3d 219, 226, n.7 (2d Cir. 2014). In addition, a public employee may enforce his Fourteenth Amendment right to be free from discrimination by bringing a suit under 42 U.S.C. § 1983 against any responsible person acting under color of state law. *Vega*, 801 F.3d at 87.[8] Finally, § 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens," has been interpreted to prohibit discrimination on the basis of race. *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998).

The plaintiffs' Title VII, § 1981, § 1983, and NYSHRL disparate treatment claims are subject to the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015); *Awad v. City of New York*, No. 13 cv. 5753, 2014 WL 1814114, at *5 (E.D.N.Y. May 7, 2014) ("Discrimination claims under § 1981, § 1983, and NYSHRL are analyzed under the same framework and pleading standard as Title VII claims.") At the pleadings stage, however, a

_____

City of New York; the plaintiffs' § 1981 and § 1983 claims are brought against all individually named defendants in their individual capacities, and the NYCHRL and NYSHRL claims are brought against all defendants.

[8] A state employee acting in his official capacity is acting "under color of state law.'" *Vega*, 801 F.3d at 88.

plaintiff need not plead every element of a *prima facie* case of discrimination; rather, a plaintiff "must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega*, 801 F.3d at 87; *see also id. at* 88 ("for a § 1983 discrimination claim to survive . . . a motion to dismiss, a plaintiff must plausibly allege a claim under the same standards applicable to a Title VII claim—and that the adverse action was taken by someone acting 'under color of state law.'").

The plaintiffs' burden at this stage is "minimal," and requires only that they "plausibly plead facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Id.* (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015)); *see also Littlejohn*, 795 F.3d at 311 ("The facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation."). In determining the plausibility of discrimination claims, "the court must be mindful of the 'elusive' nature of intentional discrimination." *Id.* at 86 (quoting *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 255, n.8). As there is rarely "direct, smoking gun evidence of discrimination," plaintiffs must usually rely on "bits and pieces of information to support an inference of discrimination, *i.e.*, a mosaic of intentional discrimination." *Id.* (internal citations and quotation marks omitted).

### a)   Adverse Employment Action

The defendants argue that the plaintiffs' claims fail because they do not allege that they suffered any adverse employment action. (Def. Mem., at 11.) Under Title VII, § 1983, and § 1981 "[a] plaintiff sustains an adverse employment action if he or she endures a materially

14

adverse change in the terms and conditions of employment." *Vega*, 801 F.3d at 85 (quoting

*Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal citation and quotation

marks omitted); *see also id.*, at 88 ("for a § 1983 discrimination claim to survive . . . a motion to

dismiss, a plaintiff must plausibly allege a claim under the same standards applicable to a Title

VII claim—and that the adverse action was taken by someone acting 'under color of state

law.'"); *Bowen-Hooks v. City of New York*, 13 F.Supp.3d 179, 211-219 (E.D.N.Y. 2014)

(applying same "adverse employment action" standard to claims brought under the Title VII, §

1983, § 1981, and the NYSHRL). "A materially adverse change is one that has an attendant

negative result, a deprivation of a position or an opportunity," and is "more disruptive than a

mere inconvenience or an alteration of job responsibilities." *Gutierrez v. City of New York*, 756

F.Supp. 2d 491, 506 (S.D.N.Y. Nov. 29, 2010) (internal citations and quotation marks omitted).

Examples of materially adverse changes include "termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices . . . unique to a particular

situation." *Galabya*, 202 F.3d at 640 (internal citation omitted). Further, "[t]he prohibition

against discrimination is not limited to 'pecuniary emoluments,' but includes discriminatorily-

motivated diminution of duties.'" *Predo v. Nissho Iwai American Corp.*, 128 F.3d 789, 791 (2d

Cir. 1991).

The plaintiffs respond that even if they did not suffer any "classic" adverse employment

actions, their allegations that they were denied overtime (Velez) and line of duty injury status

(Aronov), that Szumilo's promotion was delayed, that they were threatened with placement on

"foot post," and denied time off, "are all pecuniary punishments which carry loss of wages (paid

time) as their punishment" and therefore qualify as adverse employment actions. (Pl. Mem., at

13.) Notably, the plaintiffs generally included these allegedly adverse employment actions in

sections of the complaint identifying actions that the plaintiffs claim the defendants took in

retaliation for their filings of EEOC complaints.[9] However, whether or not the plaintiffs have

alleged adverse employment actions, as explained below, their disparate treatment claims under

Title VII, § 1981, § 1983, and the NYSHRL cannot survive because the plaintiffs have not

alleged circumstances that give rise to an inference of discrimination.

**B.        Inference of Discrimination**

To survive the defendants' motion to dismiss, the plaintiffs must "plausibly plead . . . that

the circumstances surrounding an adverse employment action give rise to an inference of

discrimination." *Dimitracopoulos v. City of New York*, 26 F.Supp.3d 200, 215 (E.D.N.Y. 2014)

---

[9] Certain of the plaintiffs' claims do not qualify as adverse employment actions for the purpose of their discrimination claims. For example, the plaintiffs allege that officers and supervisors gave them the "cold shoulder" after they filed their EEOC complaints. (Amended Complaint ¶ 184 (Aronov), ¶ 292 (Szumilo), ¶ 351 (Talavera) ¶ 404 (Velez)). Receiving the "cold shoulder" is a mere disruption that does not carry an "attendant negative result," *Gutierrez*, 756 F.Supp. 2d at 506; thus, it does not qualify as an adverse employment action. In addition, threats, including those that the plaintiffs could lose their Conditions Unit assignment, that partners would be split up, or that they would be assigned to "punishment posts," do not qualify as adverse employment actions. *See Uddin v. City of New York*, 427 F.Supp.2d 414, 429 (S.D.N.Y. 2006) ("'[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.'") (quoting *Honey v. County of Rockland*, 200 F.Supp.2d 311, 320 (S.D.N.Y.2002)). Further, John's denials of the plaintiffs' transfer requests do not qualify as adverse employment actions. A denial of a transfer may constitute an adverse employment action where it "created a materially significant disadvantage in the working conditions of the aggrieved employee," such as a change in "prestige, modernity, training opportunity, job security, or some other indicator of desirability." *Gomez v. Stonybrook Univ.*, No. CV 14-7219, 2016 WL 1039539, at *6 (E.D.N.Y. Jan. 28, 2016), report and recommendation adopted, 2016 WL 1045536 (E.D.N.Y. Mar. 15, 2016) (quoting *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 164–65 (2d Cir.2008)). Here, however, the plaintiffs do not identify the units or precincts to which they asked to be transferred (and both Talavera and Velez say that they would have been willing to accept an effective demotion), and have therefore not alleged that the denial of their transfer requests qualify as adverse employment actions.

(quoting *Kirkweig v. New York City Dep't of Educ.*, No. 12-cv-2635, 2013 WL 1651710, at *4 (S.D.N.Y. Apr. 4, 2013). A plaintiff may raise an inference of discrimination based on the temporal proximity of the alleged injury and the adverse employment action, *Vale v. Great Neck Water Pollution Control Dist.*, 80 F.Supp.3d 426, 437 (E.D.N.Y. 2015) (internal citations omitted), or by alleging that the adverse employment action was taken "because of" his protected characteristic. *Vega*, 801 F.3d at 88. Other circumstances giving rise to an inference of discrimination include, but are not limited to, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312.

The plaintiffs' allegations regarding race, ethnicity, national origin and religion relate to comments that John and Mercado made to them. For remarks to raise an inference of discrimination, there must be a "nexus between the remarks and an adverse employment decision." *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015); *see also Adam v. Glen Cove School*, No. 06-cv-1200, 2008 WL 508689, at *7 (E.D.N.Y. 2008) ("Verbal comments may constitute direct evidence of discrimination when made by a decision-maker in the adverse employment action, and where there is a close nexus between the comments and the action."). On the other hand, "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Holleman v. Art Crating Inc.*, 2014 WL 4907732, at *27 (E.D.N.Y. Sept. 30, 2014) (quoting *Gioia v. Forbes Media LLC*, 501 F.App'x 52, 55 (2d Cir. 2012)).

17

Courts in this circuit consider four factors in determining whether a remark is probative of discriminatory intent: "(1) who made the remark (i.e. a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark ...; and (4) the context in which the remark was made (i.e. whether it was related to the decision-making process)." *Mesias*, 106 F. Supp. 3d at 438 (S.D.N.Y. 2015) (quoting *Henry v. Wyeth Pharms., Inc.,* 616 F.3d 134, 149–50 (2d Cir.2010)). A connection between a remark and an adverse employment action "exists if the comments were made by the decision-maker or by someone who had great influence over the decision-maker." *Howe v. Town of Hempstead*, No. 04-cv-0656, 2006 WL 3095819, at *7 (E.D.N.Y. Oct. 30, 2006). On the other hand, "remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (abrogated on other grounds by *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177-78 (2009)). "[T]here is no bright-line rule for when remarks become 'too attenuated' to be significant to a determination of discriminatory intent." *Tolbert v. Smith*, 790 F.3d 427, 438 (2d Cir. 2015).

The difficulty with the plaintiffs' argument is that they make no connection between John's and Mercado's alleged behavior—which is concededly repulsive and offensive—and most of the adverse employment actions that they claim. Indeed, as noted above, according to the complaint, most of the actions that could qualify as adverse material employment actions were taken in retaliation for their EEOC filings, not "because of" their protected characteristics. Nor can a connection be inferred through temporal proximity, as the complaint does not date any of the allegedly adverse employment actions. Finally, there is no allegation that either John or

18

Mercado played a role in any of the adverse employment actions. *See, e.g., Mesias*, 106 F.Supp.3d at 438 ("Moreover, although Tropp was Plaintiff's supervisor both at the time he made the comments and the time she was fired, the Complaint does not allege that the remarks were 'related to the decision-making process' resulting in Plaintiff's termination."). Each plaintiff does allege that John was his direct supervisor, and that John had the authority "to make tangible employment decisions," including changes of assignments and tours, granting or denying overtime requests, and recommending transfers or promotions. (Amended Compl. ¶ 59.) However, the plaintiffs do not allege that John actually made any allegedly adverse employment decisions, nor, for the most part, does the complaint identify anyone within the 83rd Precinct who did.[10] Moreover, neither John nor Mercado made their comments in the context of threats of or actual adverse employment actions. In other words, the plaintiffs do not allege any nexus between John's and Mercado's abusive language and the allegedly adverse employment actions.[11]

---

[10] Each plaintiff does allege that John denied his request for a transfer out of the Conditions Unit, and that he threatened them with "punishment posts" such as "walking a beat at midnight on Eastern Parkway." (Amended Compl. ¶¶ 170-71, 277-78, 346-47, 398-99.) However, as explained above, *supra* n. 9, these kinds of threats do not qualify as adverse employment actions. Similarly, John's alleged denials of the plaintiff's requests to transfer out of the Conditions Unit do not constitute adverse employment actions because the plaintiffs do not identify the unit to which they asked to be transferred, and therefore cannot show a "materially significant disadvantage" in their working conditions. *Gomez*, 2016 WL 1039539, at \*6.

[11] Cases in which comments were found to raise an inference of discrimination are distinguishable from this one. For example, in *Rose v. New York City Bd. of Educ.*, 257 F.3d 156 (2d Cir. 2001), an age discrimination case, the plaintiff's supervisor told her that if she could not follow his instructions, he would replace her with someone "younger" and "cheaper." *Id.* at 158. The supervisor gave the plaintiff an unsatisfactory recommendation, and recommended that she be reassigned to a different position, which she was. *Id.* at 158-59. In other words, the comments regarding the plaintiff's age were directly connected to threats regarding her employment status, and were made "directly to her . . . by her immediate supervisor, who had enormous influence in the decision-making process." *Id.* at 162; *see also Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162 (2d Cir. 1998) ("Plainly, the warning by Steven, a decisionmaker, to

Further, the plaintiffs do not allege that other officers, who were not racial, ethnic, or religious minorities, were treated better than the plaintiffs. *See, e.g., Hagan v. City of New York*, 39 F.Supp.3d 481, 496 (S.D.N.Y. 2014) (finding that plaintiff had adequately stated a claim for discrimination where, in addition to an allegation that she was subjected to racially insensitive comments, the plaintiff also alleged that "she was subject to inferior terms and conditions of employment compared to similarly situated Caucasian employees."). In sum, although defendants John and Mercado made comments to each of the plaintiffs about their race, religion, or national origin, there is no nexus between those comments and the allegedly adverse employment actions. Therefore, the plaintiffs' claims for discrimination under Title VII, § 1983, § 1981, and the NYSHRL are dismissed against all defendants.

## C.    Discrimination under the NYCHRL

Claims brought under the New York City Human Rights Law must be analyzed "separately and independently from any federal and state law claims," and should be construed "broadly in favor of discrimination plaintiffs." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (internal citations omitted). However, claims under the NYCHRL are subject to the *McDonnell-Douglas* burden-shifting analysis applicable to Title VII, § 1983, and the NYSHRL, *Bermudez v. City of New York*, 783 F.Supp.2d 560, 577 (S.D.N.Y. 2011), and the NYCHRL utilizes the same standard for an "adverse employment action" as claims under Title VII and § 1983. *Id.* Even construing the plaintiffs' claims "broadly" in their

---

Kirsch, a man in his 60's, to 'watch your ass . . . you see all young people' may permissibly be construed as a company threat that Kirsch was vulnerable to being replaced by a younger person because of his age, rather than as a stray remark."). By contrast, in the present case, there is no allegation that John's and Mercado made their remarks in the context of the decision-making process for the allegedly adverse employment actions, or that they were even involved in the decision-making process.

favor, they still do not allege any facts that could allow the Court to infer that John and Mercado's comments were connected to any allegedly adverse employment action. As the plaintiffs do not allege facts that would allow for broader liability for discrimination under the NYCHRL than under Title VII, § 1983, § 1981, and the NYSHRL, their claims for discrimination under the NYSHRL are dismissed.

## IV.   RETALIATION CLAIMS

The plaintiffs also assert claims for retaliation under Title VII, § 1983, § 1981, the NYSHRL, and the NYCHRL.[12]  They each claim that they engaged in protected activity by filing EEOC complaints.  (*See* Amended Complaint, ¶ 183 (Aronov); ¶ 291 (Szumilo); ¶ 350 (Talavera); ¶ 403 (Velez)), and that they were then retaliated against for having filed these complaints.

### A.   Title VII, § 1983, § 1981, and NYSHRL Retaliation Claims

"Title VII's antiretaliation provision prohibits an employer from discriminating against an employee for opposing any practice made unlawful by Title VII." *Rivera v. Rochester Genessee Regional Transp. Authority*, 743 F.3d 11, 24 (2d Cir. 2012) (citing *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59-60 (2006)); 42 U.S.C. § 2000e–3(a). To survive a motion to dismiss, a plaintiff claiming retaliation under Title VII must plausibly allege that the "(1) defendants discriminated—or took an adverse action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90.  The elements of a

---

[12] The Title VII retaliation claim is asserted by all plaintiffs against the City of New York (Count V); the § 1983 claim is asserted by all plaintiffs against all defendants (Count XI); the § 1981 claims are asserted by all plaintiffs against all individually named defendants in their individual capacities (Count XV); the NYSHRL claims are asserted by all plaintiffs against all defendants (Count XXI); and the NYCHRL claims are asserted by all plaintiffs against all defendants (Count XXVII).

retaliation claim brought under § 1983 mirror those under Title VII, with the additional requirement that the defendants must have acted under color of state law. *Id.* at 91. Similarly, a claim of retaliation under the NYSHRL is analyzed under the same standards as under Title VII and § 1983. *Gomez v. Stonybrook Univ.*, No. CV 14-7219, 2016 WL 1039539, at *8 (E.D.N.Y. Jan. 28, 2016), report and recommendation adopted, 2016 WL 1045536 (E.D.N.Y. Mar. 15, 2016).

In the retaliation context, a "material adverse" action is one that "a reasonable employee would have found" to be materially adverse, which means that "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rivera*, 743 F.3d at 25 (quoting *Burlington Northern*, 548 U.S. at 68). Notably, "the anti-retaliation provision [of Title VII], unlike [Title VII's substantive provision], is *not* limited to discriminatory actions that affect the terms and conditions of employment." *Kessler v. Westchester County Dept. of Social Services*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Burlington Northern*, 548 U.S. at 64) (emphasis in original).

"Actions that are 'trivial harms'-*i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience'-are not materially adverse." *Rivera*, 743 F.3d at 25 (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (internal citation omitted)). In addition, the plaintiff must plausibly plead "a connection between the act and his engagement in protected activity." *Vega*, 801 F.3d at 90. "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action," *id.* (internal citations omitted), or by "other circumstantial evidence such as disparate treatment of other employees who engaged in similar conduct." *Dechberry v. New York City Fire Department*, 124 F.Supp. 3d 131, 154 (E.D.N.Y. 2015). A plaintiff may also

show a retaliatory purpose directly, "through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id.* (quoting *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

To show that an employer took an action "because" of the plaintiff's protected activity, a plaintiff must plausibly allege that "the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90. While it is "not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision," but-for causation does not "require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 91 (quoting *Zann Kwan v. Andalex Group*, 737 F.3d 834, 846 (2d Cir. 2013)).

Further, as the Supreme Court has observed,

> Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by simple recitation of the words used or the physical acts performed. A schedule change in an employee's schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite and employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 69).

Although the plaintiffs argue that they can "certainly" establish "a causal connection between the protected activity and the adverse employment action," (Pl. Mem., at 18), they do not point to any facts to support their argument. Of course, a discriminatory purpose can be shown "indirectly by timing"—in other words, "protected activity followed closely in time by adverse employment action." *Vega*, 801 F.3d at 90. For the most part, however, the plaintiffs

argue only that the adverse employment actions took place "shortly after" or "immediately after" the filing of their EEOC complaints; they do not identify even general or approximate dates on which the allegedly retaliatory actions took place. This is insufficient to allege retaliation under Title VII, § 1983, or § 1981. *See Dechberry*, 124 F.Supp. 3d at 154 ("Simply pleading that an adverse employment action occurred later in time than plaintiff's protected activity is insufficient to survive a motion to dismiss.") (internal citation omitted); *Mandavia v. Columbia University*, 912 F.Supp.2d 119, 133 (S.D.N.Y. 2012), *aff'd*, 556 F. App'x 56 (2d Cir. 2014) ("Plaintiff appears to offer little more than a highly speculative argument that because Columbia's immigration action occurred later in time than his first EEOC Complaint, the Court should infer retaliatory motive. This argument does not suffice."); *Anderson v. Davis Polk & Wardwell LLP*, 850 F.Supp. 2d 392, 413 (S.D.N.Y. 2012) (dismissing retaliation claims where there was "nothing to connect [plaintiff's] complaint . . . and the self-described retaliatory actions aside from the fact that plaintiff groups these actions underneath the heading of 'retaliation' in his [pleadings]").[13]

In those instances in which the plaintiffs provide dates for the actions that they allege were retaliatory, they do not connect those activities to the defendants. First, Aronov claims that his locker and car were vandalized after he filed his EEOC complaint. (Amended Complaint, ¶¶ 191, 194-197.) He filed his EEOC charges on February 3, 2014, February 20, 2014, and June 16, 2014; he claims that he learned that his locker had been defaced with the word "rat" on February

---

[13] The plaintiffs argue that they have stated a claim for a retaliatory hostile work environment. (Pl. Mem., at 17.) A "retaliatory hostile work environment has been considered actionable when incidents of harassment following complaints were sufficiently continuous and concerted to have altered conditions of an employee's employment." *Thomas v. iStar Financial, Inc.*, 438 F.Supp.2d 348, 365 (S.D.N.Y. 2006), *aff'd*, 629 F.3d 276 (2d Cir. 2010). However, the incidents about which the plaintiffs complain, including that they received the "cold shoulder" and were threatened with punishment posts, do not rise to the level of a hostile work environment.

20, 2014, that he found nails in his car's tires on April 17, 2014 and May 14, 2014, and that on April 14, 2014 and May 23, 2014 he found that his car tires were flat.  While an employer can "effectively retaliate against an employee by taking actions not directly related to his employment," or by causing that employee harm outside the workplace, *Burlington Northern*, 548 U.S. at 63, here there is no allegation that anyone from the 83rd Precinct perpetrated these acts, let alone a supervisor or someone acting at a supervisor's direction.  In other words, there is nothing to connect these allegedly adverse actions to the plaintiffs' employer, and they therefore cannot form the basis of a retaliation claim.

Aronov also provides dates relating to the denial of his request to transfer to the Intelligence Unit.  (Amended Complaint ¶¶ 199-207.)  He interviewed for the position in October of 2013 and January of 2014, and alleges that he learned that he did not get the transfer at some point after May of 2014.  (*Id.* ¶¶ 199-200, 204-205.)  The date on which he learned he had not received the position, however, is too far removed from his February 3 and 20, 2014 EEOC filings to allow an inference of causation.[14]  While the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," courts in this circuit have found that a passage of more than two months between a protected activity and an adverse action is too long to permit an inference of causation. *See Preuss v. Kolmar Labs., Inc.,* 970 F.Supp.2d 171, 198 (S.D.N.Y. 2013) (quoting *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554-55 & n.5 (2d Cir. 2001) (other citations omitted); *see also Garrett v. Garden City Hotel, Inc.,* 2007 WL 1174891, at *21

---

[14] Aronov filed a supplemental charge on June 16, 2014, but this was after he learned that he had not received the position in the Intelligence Unit.

(E.D.N.Y. Apr. 19, 2007) (two and one-half month interval between plaintiff's complaint of

racial discrimination, in the absence of any other evidence of retaliatory motive, "precludes a

finding of retaliatory motive"). *Nicastro v. Runyon*, 60 F.Supp.2d 181, 185 (S.D.N.Y. 1999)

("Claims of retaliation are routinely dismissed when as few as three months elapsed between the

protected . . . activity and the alleged act of retaliation."). Nor does Aronov offer any other

evidence of a retaliatory motive. Therefore, Aronov does not adequately allege retaliation with

respect to his denial of a transfer to the NYPD Intelligence Division.

Plaintiff Szumilo alleges that he was retaliated against after filing his EEOC complaints

because unnamed officers and supervisors gave him the "cold shoulder," because he was

"repeatedly threatened" that he would not be promoted and that he would lose his Conditions

Unit assignment, and was told not to "hang around" with Aronov and Cardenas. (Amended

Complaint ¶¶ 292-295, 297-99.) He also claims that Sergeant Ben-Safar told him that he "better

be on point with everything from now on," and that he and his team were "being watched at all

times;" Ben-Safar added that this is what the plaintiffs "get for bringing attention to [the]

precinct" and themselves. (*Id.* ¶¶ 292-296.) The "cold shoulder" allegations do not constitute

adverse employment actions for the purpose of the plaintiffs' retaliation claims, as they would

not have "dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Rivera,* 743 F.3d at 25 (quoting *Burlington Northern*, 548 U.S. at 68). Moreover, for the most

part, Szumilo does not identify the person or people who threatened him, when they made those

threats, and in what context; in other words, he does not provide any information that would

allow the Court to infer a retaliatory motive. And, while he identifies one supervisor—Sergeant

Ben-Safar—who made comments, he does not connect those remarks, either temporally or

otherwise, to the filing of his EEOC complaints.  In sum, Szumilo's allegations of retaliation are conclusory, without any factual basis.

Finally, both Talavera and Velez allege that they received the "cold shoulder" from officers and supervisors after filing their EEOC complaints (Amended Complaint ¶¶ 351, 404); as explained above, however, this does not qualify as an adverse employment action for purposes of their retaliation claims.  Velez also alleges that he has experienced further retaliation since the filing of this action, including that his gun and shield were removed and he has been denied all overtime opportunities.  (*Id.* ¶ 406.)  These allegations are conclusory; there are no facts alleged, such as dates or names, that could allow the Court to find that these actions were taken because of his participation in this litigation.[15]

Finally, the plaintiffs allege that Lieutenant Akhtar "has repeatedly referenced" the lawsuit during roll call, and that "[t]his has served to perpetuate Plaintiffs' alienation from their fellow officers."  (Amended Complaint ¶ 64.)  The plaintiffs do not specify what the lieutenant said, nor how it "alienated them from other officers."  In any event, the conduct does not rise to a level that would "dissuade a reasonable worker from making or supporting a charge of discrimination."  *Rivera,* 743 F.3d at 25 (quoting *Burlington Northern*, 548 U.S. at 68).

Therefore, the plaintiffs do not state a claim for retaliation against any defendant under Title VII, § 1983, § 1981, or the NYSHRL.

**B.    NYCHRL Retaliation Claims**

The NYCHRL prohibits an employer from "retaliat[ing] . . . in any manner against any person because such person has . . . opposed any practice forbidden under this chapter."  N.Y.C.

---

[15] The plaintiffs additional complaints about the way in which their EEOC claims were investigated do not rise to the level of a hostile work environment or to an investigation conducted in a manner that would have dissuaded a reasonable worker from making a complaint.

Admin. Code § 8-107(I)(a). As explained in section III.D, *supra*, the Court must analyze the plaintiff's claim for retaliation under the NYCHRL "separately and independently from any federal and state law claims . . . construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Lopez v. City of New York*, No. 14-cv-3285, 2016 WL 3129184, at *4 (E.D.N.Y. June 2, 2016) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)). "Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Id.* (quoting *Mihalik*, 715 F.3d at 109). In considering a claim under the NYCHRL, a court is to consider the "totality of the circumstances . . . because the overall context in which [the challenged conduct occurs] cannot be ignored." *Id.* (quoting *Mihalik*, 715 F.3d at 113).

To establish a prima facie case of retaliation under the NYCHRL, a plaintiff must demonstrate that "(1) he participated in a protected activity known to the defendant; (2) the defendant took an employment action that disadvantaged the plaintiff; and (3) that a causal connection exists between the protected activity and the adverse employment action." *Id.* (quoting *Semanovic v. NYSE Grp., Inc.*, No. 06-cv-3046, 2007 WL 4563431, at *5 (S.D.N.Y. Dec. 21, 2007)). The retaliatory action must "be reasonably likely to deter a person from engaging in protected activity," and the plaintiff must show a "causal link" between the protected activity and the retaliatory act. *Bermudez*, 783 F.Supp.2d., at 577 (internal citations omitted). Here, even under the broader standards of the NYCHRL, the Court finds that the plaintiffs do not allege facts that could establish a causal nexus between the protected activity and the allegedly adverse employment actions. Therefore, the plaintiffs' claims for retaliation under the NYCHRL are dismissed against all defendants.

## V.    HOSTILE WORK ENVIRONMENT CLAIMS

The plaintiffs also allege that they were subject to a hostile work environment at the 83rd

Precinct under Title VII, § 1981, § 1983, the NYSHRL and the NYCHRL.[16]  To state a claim for

a hostile work environment under Title VII, §§ 1981[17] and 1983, and the NYSHRL, a plaintiff

must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult

that is sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320-321

(2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), abrogated on other

grounds by *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 753 (1993)); *Whidbee v.*

*Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (hostile work environment

claim under § 1981, "[a]s under Title VII," is shown "when the incidents of harassment occur

either in concert or with a regularity that can be termed pervasive.") (internal citation omitted);

*Summa v. Hofstra University,* 708 F.3d 115, 123 (2d Cir. 2013) ("Hostile work environment

claims under both Title VII and the NYSHRL are governed by the same standard."). "This

standard has both objective and subjective components:  the conduct complained of must be

severe or pervasive enough that a reasonable person would find it hostile or abusive, and the

victim must subjectively perceive the work environment to be abusive." *Littlejohn,* 795 F.3d at

321 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)).  "The incidents complained

---

[16] The plaintiffs' claims for a hostile work environment under Title VII are brought against the City of New York; under § 1983 and § 1981 against the individually named defendants in their individual capacities; and under the NYSHRL and the NYCHRL against all defendants.

[17]  Section 1981 has been interpreted to provide "a cause of action for race-based employment discrimination based on a hostile work environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000).

of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quoting *Raspardo*, 770 F.3d at 114).

The Court must consider the "totality of the circumstances" in assessing whether a plaintiff suffered a hostile work environment, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23.) These same standards apply to both race-based and sex-based hostile work environment claims. *Richardson v. New York State Dep't of Corr.*, 180 F.3d 426, n.2 (2d Cir. 1999) (abrogated on other grounds by *Burlington Northern*, 548 U.S. 53 (2006)); *see also Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) ("One form of gender discrimination prohibited by Title VII is sexual harassment that results in a 'hostile or abusive work environment.'") (internal citation omitted). In their complaint, the plaintiffs do not specify whether their hostile work environment claims are race or sex-based; interpreting the complaint most favorably to the plaintiffs, the Court will assume that they are alleging both.

Finally, in order to establish a sex-based or race-based hostile work environment claim under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex or race. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal citations omitted); *see also Sullivan v. Newburgh Enlarged Sch. Dist. Clarence Cooper*, 281 F.Supp.2d 689, 704 (S.D.N.Y. 2003) ("Even when a plaintiff can establish that she was exposed to an objectively and subjectively hostile work environment, she will not have a claim . . . unless she can also demonstrate that the hostile work environment was caused by animus towards her as a result of membership in a protected class.") (internal citation omitted). "An environment," however, "that

30

would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes." *Id.* (quoting *Forts v. City of N.Y. Dep't of Corr.,* No. 00 Civ. 1716, 2003 WL 21279439, at \*4 (S.D.N.Y. June 4, 2003)). Where "reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004).

Here, the plaintiffs have sufficiently pled that they suffered a hostile work environment based on both race and sex that was severe enough to alter the conditions of their employment. Plaintiff Aronov alleges that defendant John "repeatedly" called him a "dirty Jew" and a "dumb Jew" (*id.* ¶¶ 142-43), that Mercado referred to him as a "Chechenian terrorist" (*id.* ¶ 181), and that John "often belittle[d] Aronov due to the different customs in his religion." (*Id.* ¶ 162). Plaintiff Szumilo alleges that John "repeatedly" called him a "dumb Pollock" and "dumb immigrant" (*id.* ¶ 211-214), and said "on several occasions" that he could be a "dirty Jew" since he came from Poland, and that he was lucky that "Hitler didn't kill all the Poles and Jews." (*Id.* ¶ 216.) Szumilo also alleges that Mercado called him a "dumb Pollock" and told a joke about Polish people. (*Id.* ¶ 286.) Plaintiff Talavera alleges that John "repeatedly" called him "Mexican," "greasy," and said that Talavera "look[ed] like a Mexican crack head." (*Id.* ¶¶ 303, 306.) Plaintiff Velez alleges that John "repeatedly" called him "taco" and "Mexican." (*Id.* ¶ 356.)

Further, each plaintiff alleges that John regularly grabbed their buttocks and groin areas. (*Id.* ¶ 144 (Aronov alleging that John "repeatedly" grabbed his butt and groin area); *id.* ¶¶ 364, 381 (Velez alleging that John "constantly" grabbed his butt and groin area); *id.* ¶¶ 219, 239, 243,

247-48 (Szumilo alleging that John grabbed his butt and groin area); *id.* ¶¶ 312, 329 (Talavera alleging that John "constantly" grabbed Talavera's "butt and groin area.")). They further allege that John repeatedly rubbed and caressed their thighs while they were driving, (*id.* ¶ 148 (Aronov); ¶ 368 (Velez); ¶ 223 (Szumilo); ¶ 316 (Talavera)), and Aronov and Szumilo allege that John often took their hands and made them touch his crotch while driving. (*Id.* ¶ 148 (Aronov); ¶ 224 (Szumilo)). ). The plaintiffs also allege that John made sexually-charged comments; for example, they allege that he would say 50-70 times per day, "I want to get my dick sucked" or "can I smell your muffin?" (*Id.* ¶ 147 (Aronov); ¶ 218 (Szumilo); ¶ 314 (Talavera); ¶ 366 (Velez).) John greeted male officers at the front desk by saying, "What's up . . . get your dick sucked?" (*Id.* ¶ 146 (Aronov); ¶ 217 (Szumilo); ¶ 313 (Talavera); ¶ 365 (Velez).)

Based on these allegations, each plaintiff sufficiently pleads that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn,* 795 F.3d at 320-21. First, each plaintiff alleges that John "repeatedly" belittled them with racial and ethnic epithets. While, as this case proceeds, there will be a factual issue as to the extent of the harassment, the plaintiffs have sufficiently alleged that the discriminatory insults were "sufficiently severe or pervasive" to survive a motion to dismiss. *See, e.g., Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir. 2000), *superseded by statute on other grounds* (triable issue of fact as to hostile work environment where supervisor subjected plaintiff and others to "blatant racial epithets on a regular if not constant basis").

In addition, the plaintiffs adequately plead a hostile work environment due to sexual harassment. For example, the plaintiffs allege that John "repeatedly" grabbed their buttocks and groin area and caressed and rubbed their thighs while they were driving, and that they witnessed

incidents of sexual harassment directed at other plaintiffs. That these alleged incidents involved behavior that was "physically threatening or humiliating" towards the plaintiffs, *Littlejohn*, 795 F.3d at 321, weighs in favor of a finding that the plaintiffs have adequately stated a claim for a sex-based hostile work environment. *See Dillon v. Ned Management, Inc.*, 85 F.Supp.3d 639 (E.D.N.Y. 2015) ("A single incident of contact with an intimate body part is sufficient to establish a hostile work environment claim."). These allegations in and of themselves would no doubt support a claim for a hostile work environment based on sex; however, this is just a sample of the allegations in the Amended Complaint relating to sexual harassment. *See, e.g.*, Amended Complaint, ¶¶ 146-47 (alleging that defendant John said, 50-70 times per day, "I want to get my dick sucked" or "I want to smell your muffin."); *id.* ¶¶ 146, 217, 313, 365 (alleging that John greeted male officers at the front desk by saying, "What's up . . . get your dick sucked?"); *id.* ¶¶ 159, 246, 328, 380 (plaintiffs alleging that they witnessed John asking Ms. Cardenas to hold his penis). The sexually harassing conduct alleged in the Amended Complaint, which consists of both physical behavior and a variety of offensive comments, qualifies as "severe and pervasive" and there is no basis on which to dismiss the plaintiffs' claims for a sex-based hostile work environment. *See Cruz*, 202 F.3d at 571 (a reasonable jury could find sex-based hostile work environment based on evidence that defendant made "repeated" remarks to the plaintiff that "women should be barefoot and pregnant, and based on the "physically threatening" nature of the defendant's behavior towards her.)

The defendants argue, however, that because John was "indiscriminate" in his harassment, targeting both males and females, his conduct could not have been "because of" gender. (Def. Mem., at 14, 17.) It is true that the Amended Complaint alleges that in some instances John treated Cardenas, a female, in the same ways that he treated the male plaintiffs.

For example, plaintiff Aronov alleges that John threw him down and threatened to rape him; Velez and Talavera allege that they witnessed Aronov do the same thing to Cardenas. In addition, while the plaintiffs each allege that John "repeatedly" grabbed their buttocks and groins, Aronov and Szumilo also allege that they witnessed John repeatedly slap the buttocks of defendant King, a female. However, the Second Circuit has found that while the fact that both men and women were allegedly subject to sexual harassment was a "relevant evidentiary consideration," it could not "end the necessarily individualized and fact-sensitive inquiry into why [the plaintiff] was treated as she was." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Indeed, "[t]he inquiry into whether ill treatment was actually sex-based discrimination cannot be short-circuited by the mere fact that both men and women were involved. For it may be the case that a co-worker or supervisor treats both men and women badly, but women worse." *Id.*; *see also Wentworth v. Hedson*, 493 F.Supp.2d 559, 568 (E.D.N.Y. 2007) (denying summary judgment on plaintiff's claim for unlawful interference with housing rights due to harassment, as there was a genuine issue of fact as to whether the defendants were "equal opportunity harassers"). Although four men and one woman, Ms. Cardenas, have alleged sexual harassment at the 83rd Precinct, whether individuals of both genders were equally subject to harassment bears further factual inquiry, and is not appropriate for resolution on a motion to dismiss.

Similarly, the defendants argue that the plaintiffs do not meet the standard for pleading a claim for same-sex harassment, as set forth by the Supreme Court in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998). There, while the Court held that there was no "categorical rule excluding same-sex harassment from the coverage of Title VII," the plaintiff still needed to show that he suffered "discrimination because of sex." *Barrows v. Seneca Foods Corp.*, 512 Fed.Appx. 115, 117 (2d Cir. 2013) (quoting *Oncale*, 523 U.S. at 79-80). The Court

provided three examples of evidence a plaintiff could present to satisfy this test: (1) the harasser is homosexual (and therefore, presumably, motivated by sexual desire); (2) a victim is "harassed in such sex-specific and derogatory terms by [someone of the same gender] as to make it clear that the harasser is motivated by general hostility to the presence of [someone of the same gender] in the workplace; or (3) there is "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Barrows*, 512 Fed.Appx at 117 (quoting *Oncale*, 523 U.S. at 80-81). The Amended Complaint does not allege that John is homosexual, but it does allege harassment in sex-specific terms, such as grabbing men's crotches and greeting male officers with crude references to their genitalia. While there is a real question as to whether John was equally vile to both men and women, as noted above, this is a matter for further factual development as the case progresses. Therefore, the Court finds that the plaintiffs adequately state a claim for hostile work environment based on gender and race.

This determination, however, does not end the inquiry; the Court must consider whether liability for a hostile work environment may be imputed to the City, as well as whether the individual defendants may be held liable.

A.    **Hostile Work Environment Claims against the City under Title VII and the NYSHRL**

In order to sustain a hostile work environment claim against the City, there must be "a specific basis [that] exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002); *see also Raspardo*, 770 F.3d at 114 (citing *Harris*, 510 U.S. at 21) ("Hostile work environment claims under Title VII thus look to the circumstances of the plaintiff's employment, and hold the *employer* liable when the misconduct in the workplace is so severe as to alter the terms and conditions of the plaintiff's employment.")

(emphasis in original). In general, an employer will be liable for a hostile work environment if the employer knows of the hostile work environment but fails to take appropriate remedial steps. *Smith v. Town of Hempstead Dept. of Sanitation Sanitary Dist. No. 2*, 798 F.Supp.2d 443, 455 (E.D.N.Y. 2011) (citing *Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009). This standard requires a plaintiff to show that "(1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Duch*, 588 F.3d at 763.

The plaintiffs have alleged facts sufficient to sustain their claim that the allegedly hostile work environment at the 83rd Precinct may be imputed to the City. First, defendant John, who was alleged to have been involved in creating the hostile work environment, was a Conditions Unit supervisor. (Amended Complaint ¶¶ 11, 59.) While "limited defenses may be available, an employer is presumed responsible when the perpetrator of the harassment was the victim's supervisor." *See Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001); *see also Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001) ("An employer may be held vicariously liable under Title VII when a supervisor creates a hostile work environment.") (internal citations omitted). Further, each plaintiff alleges that other supervisors within the precinct witnessed, and were even subjected to, John's allegedly harassing behavior, but did not take sufficient action to stem his behavior. *See* Amended Complaint ¶¶ 166, 272, 341, 393 (defendant Akhtar told John to "stop the sexual innuendo" and that he was making everyone uncomfortable, but "neither an official complaint was made nor an investigation conducted"); *id.* ¶¶ 176, 284 ("[M]uch of the discrimination and harassment was done in front of the Integrity Control Officer, defendant Sergeant King, but she did nothing and was even harassed by John herself."); *see also* ¶¶ 251, 332, 384 ("John has had prior complaints lodged against him, yet the NYPD has failed to take

any action"). These facts support a finding that liability may be imputed to the City. *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (finding that plaintiff had alleged sufficient facts to survive summary judgment on hostile work environment claims where he "has provided evidence that both his immediate supervisor and the supervisor for the entire TVB was aware that he was experiencing a hostile work environment, yet neither took any action to disapprove of or to remedy the situation."). Therefore, each of the four plaintiffs in this action – Aronov, Szumilo, Talavera, and Velez – have stated a claim for a hostile work environment based on both gender and race discrimination against the City under Title VII and the NYSHRL.

**B.     Hostile Work Environment Claims Against the City under § 1983**

Similarly, in order to plead a claim for a hostile work environment against the City under §§ 1981 and 1983, a plaintiff suing a municipality "is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Littlejohn*, 795 F.3d 297, 314-15 (quoting *Patterson*, 375 F.3d at 226)). "The plaintiff 'need not identify an express rule or regulation,' but can show that 'a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials." *Id.* at 315 (internal citation omitted). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978)).

Here, the plaintiffs do not allege that the defendants acted pursuant to an "express rule or regulation;" rather, drawing all reasonable inferences in the plaintiffs' favor, their allegation is that the defendants' unconstitutional conduct was "so persistent and widespread" that the

municipality could be found to have constructively acquiesced in it, or that the municipality was "deliberately indifferent" to it. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Jones*, 691 F.3d at 82 (acts could justify municipal liability if they were "sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses"); *Davis v. City of New York*, 959 F.Supp.2d 324, 350, n.108 (S.D.N.Y. 2013) ("If a municipality engages in sufficiently persistent and widespread unconstitutional practices, *Monell* liability will attach, even in the absence of direct evidence of acquiescence by policymakers.").

The plaintiffs have adequately plead their § 1983 hostile work environment claims against the City for substantially the same reasons that they have done so under Title VII. Although the plaintiffs have not plead that there was a formal policy in place that allowed or caused the hostile work environment, they have adequately plead that the allegedly hostile work environment was "so persistent and widespread" that it constituted a custom or usage of which "supervisory authorities must have been aware." *See Jones*, 691 F.3d at 13. Here, as noted above, the plaintiffs allege that some of their supervisors were actually aware of, and were even targets of, John's behavior. Indeed, the Amended Complaint describes conduct by John that is persistent and pervasive enough that it would be difficult for supervisors to be unaware of it, and it does not appear that John made any efforts to hide his behavior. For example, John is alleged to have announced multiple times per day that he wanted "to get [his] dick sucked," and that he greeted other officers by saying, "What's up . . . get your dick sucked?" Similarly, the plaintiffs allege that John threatened to rape Aronov and Cardenas after throwing them to the ground. The

pervasive and seemingly public nature of John's behavior, at least as alleged in the Amended Complaint, would have to have been obvious to other supervisors.

Therefore, at this early stage of the proceedings, the Court finds that the plaintiffs' allegations are sufficient to raise a claim for municipal liability for hostile work environment under §§1981 and 1983. *See Kohutka v. Town of Hempstead*, 994 F.Supp.2d 305, 330 (E.D.N.Y. 2014) (claims for hostile work environment against municipality survived summary judgment where, among other things, "the record indicates that the Plaintiff was called sexually explicit and derogatory term in the workplace in front of multiple supervisors as well as several employees, but [the individual defendant] was never suspended or reprimanded for his behavior.").

## C.   Hostile Work Environment Claims against the Individual Defendants

In addition to their claims against the City, the plaintiffs bring claims for a hostile work environment against the individual defendants in their individual capacities under § 1981, § 1983, and the NYSHRL. "An individual may be held liable under §§ 1981 and 1983 only if that individual is 'personally involved in the alleged deprivation.'" *Littlejohn*, 795 F.3d at 314; *see also Raspardo*, 770 F.3d at 113-15.

Similarly, under both the NYSHRL and NYCHRL, an individual may only be held liable for discriminatory conduct in which he or she participated. *See Feingold*, 366 F.3d at 157-59. For a manager or supervisor, personal involvement can include a "failure to take action upon receiving information that constitutional violations are occurring." *Smith v. Town of Hempstead*, 798 F.Supp.2d 443, 455 (E.D.N.Y. 2011), quoting *Patterson*, 375 F.3d at 229). Moreover, where a plaintiff alleges that "multiple individual defendants have engaged in uncoordinated and

39

unplanned acts of harassment, each defendant is only liable under § 1983 when his own actions are independently sufficient to create a hostile work environment." *Raspardo*, 770 F.3d at 115.

### 1.    Hostile Work Environment Claims against King and Akhtar

The defendants argue that the plaintiffs' allegations against Akhtar and King "amount to pleading that both observed John's" allegedly sexually harassing conduct, which they claim is insufficient to support a claim of individual liability against them for a hostile work environment. (Def. Mem., at 22.) However, individual liability "in hostile work environment claims may also involve supervisory liability." *Raspardo*, 770 F.3d at 116. To establish the personal liability of a supervisory defendant, the plaintiffs may show one of the following:

> (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 116 (quoting *Colon v. Coghlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also Littlejohn*, 795 F.3d 297, 314 (same). In addition to meeting one of these requirements, the plaintiffs must show that "the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation," and that the "supervisor's behavior constituted intentional discrimination on the basis of a protected characteristic." *Raspardo*, 770 F.3d at 116 (internal citations and quotations omitted). "Gross negligence" is "the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of . . . harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Id.* (quoting *Poe v. Leonard*, 282 F.3d 123, 140 n. 14, 146 (2d Cir. 2002) (internal citations, alterations, and quotation marks omitted). This

standard is satisfied where "the plaintiff establishes that the defendant-supervisor was aware of a

subordinate's prior substantial misconduct but failed to take appropriate action to prevent future

similar misconduct before the plaintiff was eventually injured." *Raspardo*, 770 F.3d at 117.

Finally, a supervisor is protected by qualified immunity as long as "reasonable officials could

disagree about whether the supervisor's action was grossly negligent in light of clearly

established law." *Id.*

   The plaintiffs allege that King and Akhtar, who were plaintiffs' supervisors, witnessed

John's allegedly sexually harassing behavior.  Plaintiffs Aronov and Szumilo allege that "[m]uch

of [John's] discrimination and harassment" happened in front of King, a sergeant and Integrity

Control Officer, but that she did nothing to stop the behavior. (Amended Complaint ¶¶ 176,

284.) Indeed, as noted above, they allege that John harassed King.  Each of the plaintiffs alleges

that Akhtar told John, in the presence of others, to "stop the sexual innuendo," but that "upon

information and belief neither an official complaint was made nor an investigation conducted.

(*Id.* ¶¶ 166, ¶ 272, ¶ 341, ¶ 393.)  In other words, the plaintiffs allege that King and Akhtar were

supervisors who were aware of John's behavior, but failed to take action to prevent it.

   However, it is not clear that John was a subordinate of King and Akhtar, or what King's

role as Integrity Control Officer required; further, this analysis is potentially complicated by the

fact that King is alleged to have been a subject of John's harassment.  These will be matters for

further factual development.  At this stage, the Court must resolve all ambiguities in favor of the

plaintiffs, and the Court finds that each plaintiff has stated a claim against Akhtar and King for

hostile work environment based on sexual harassment.  On the other hand, as there is no

allegation that Akhtar and King were involved in or were aware of the epithets John aimed at the

plaintiffs, or that they were witnesses to or were aware of these epithets, any hostile work environment claims against them based on race, national origin, or religion are dismissed.

### 2.    Hostile Work Environment Claims against Mercado and Colon

First, plaintiffs Talavera and Velez do not make any factual allegations with respect to defendants Mercado or Colon; therefore, their hostile work environment claims against defendants Mercado and Colon in their individual capacities are dismissed.  On the other hand, both Aronov and Szumilo do make factual allegations against Mercado and Colon.  Szumilo alleges that on the first day that Mercado took over the Conditions Unit, he called Szumilo a "dumb Pollock" and told a joke about Polish people.  (*Id.* ¶ 286).  Aronov alleges that Mercado asked him, "how do I know you're not a terrorist from Uzbekistan?" and referred to him as a "Chechan terrorist."  (*Id.* ¶ 82.)  Further, both Aronov and Szumilo allege that Colon said to Ms. Cardenas in Mercado's presence, "I want to lick your ass," and that he wanted to suck her toes; rather than addressing the situation, Mercado "threatened Cardenas with being forced to work with Colon."  (*Id.* ¶¶ 178-180, ¶¶ 287-290.)

First, with respect to the ethnicity-based epithets, Szumilo and Aronov have not plead that the comments made by Colon and Mercado were so "severe or pervasive" that they created a hostile work environment.  Unlike the allegations that John "repeatedly" called the plaintiffs names, Mercado and Colon are alleged only to have made these comments on isolated occasions; this does not rise to the level of a claim for hostile work environment.  *See Brennan v. Metropolitan Opera Ass'n Inc.,* 192 F.2d 310, 318 (2d Cir. 1999) ("[i]solated, minor acts or occasional episodes" do not warrant relief for hostile work environment); *see also Alfano*, 294 F.3d at 374 (five incidents over the course of four years insufficient as a matter of law to establish a hostile work environment); *Forgione v. City of New York*, No. 11-cv-5248, 2012 WL

4049832, at *7 (E.D.N.Y. Sept. 13, 2012) (dismissing hostile work environment claims under the ADA where defendant "made several offensive quips to [the plaintiff] about his perceived disability and told [the plaintiff] he needed to see a psychiatrist"). Nor were these isolated incidents "of sufficient severity" that they could, on their own, "alter the terms and conditions of employment as to create" a hostile work environment. *Patterson*, 375 F.3d at 227 (internal citations omitted). Therefore, Szumilo and Aronov's claims for a hostile work environment based on race, national origin, or religion against defendants Mercado and Colon are dismissed.

Next, the Court considers whether Aronov and Szumilo have adequately stated claims for a sex-based hostile work environment against Mercado and Colon. Their claims against Colon are based on what they heard him say to and about Ms. Cardenas, and their claims against Mercado are based on his failure, as a supervisor, to do anything in response to Colon's behavior. Generally, however, isolated comments—such as the two comments at issue here— are insufficient to raise a claim for a hostile work environment. *See Thomas v. iStar Financial, Inc.*, 438 F.Supp.2d 348, 363 (2006) ("The United States Supreme Court has held that occasional off-color or inappropriate remark with racial or sexual undertones do not alone create a hostile work environment.") (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271-72 (2001)). Further, although the alleged comments to Ms. Cardenas were reprehensible and demeaning, the Court does not find that they are independently sufficient to give rise to individual liability for Mercado and Colon to Aronov and Szumilo. Therefore, Aronov and Szumilo's claims against Mercado and Colon for a hostile work environment are dismissed.

**D.     Hostile Work Environment under NYCHRL**

As noted above, the standard for maintaining a hostile work environment claim under NYCHRL is lower than under the state and federal statutes. *Mihalik, Inc.*, 715 F.3d 102, 109 (2d

Cir. 2013) (finding that courts "must analyze NYCHRL claims separately and independently from any federal and state law claims," and must "construe the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent such a construction is reasonably possible.") (internal citations omitted); *see also Bermudez*, 783 F.Supp.2d at 579 ("The New York City Human Rights Law was intended to be more protective than the state and federal counterpart.") (quoting *Farrugia v. N. Shore Univ. Hosp.*, 13 Misc.3d 740, 820 N.Y.S.2d 718, 724 (N.Y.Sup.Ct. 2006)).

Liability under the NYCHRL is "determined by the existence of unequal treatment," and there may be liability for a hostile work environment under the NYCHRL for conduct that does not rise to the level of "severe or pervasive." *Bermudez*, 783 F.Supp. 2d at 579 (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 38 (2009)). Under the NYCHRL, the issue in a hostile work environment claim based on harassment is whether the plaintiff has shown that she was "treated less well than other employees because of her gender." *Id.* at 596 (quoting *Williams*, 872 N.Y.S.2d at 39). While the NYRHCL is not a "general civility code," *id.* at 604 (internal citations omitted), under appropriate circumstances, even "a single comment" may be actionable under the NYCHRL. *Mihalik*, 715 F.3d at 113 (quoting *Williams*, 872 N.Y.S.2d at 40-41 and n.30).

Here, since the plaintiffs' hostile work environment claims against the City and against individual defendants Akhtar and King survive under Title VII and § 1983, they clearly survive the more liberal standards under the NYCHRL. While the plaintiffs' hostile work environment claims against Mercado and Colon did not survive under Title VII, § 1983, and § 1981, an

44

analysis under NYCHRL leads to a different result.[18]  Under the NYCHRL, the alleged conduct need not rise to a level that can be deemed "severe and pervasive," and even a "single comment" may be actionable under the right circumstances.  *Mihalik,* 715 F.3d at 113.  At this stage, it has not been established that there are no facts under which Aronov and Szumilo could show that Mercado's comments to them, or his harassment of Cardenas in their presence, could rise to the level of a hostile work environment under the NYCHRL.  Therefore, Aronov and Szumilo's claims against Mercado and Colon survive under the NYCHRL.

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss the plaintiffs' amended complaint (ECF 41) is granted in part and denied in part.

**SO ORDERED.**



s/Ann M. Donnelly

_____

Ann M. Donnelly
United States District Judge


Dated: Brooklyn, New York
          September **8** , 2016

---

[18] As plaintiffs Talavera and Velez do not make any factual allegations against defendants Mercado or Colon, their hostile work environment claims against them under the NYCHRL are dismissed.